PARRO, J.,
dissenting.
hi disagree with the majority in this case, because I believe that the Project’s financing scheme violates Article VII, Section 14(A) of the Louisiana Constitution by donating the use of government-owned property to a private entity.
The complex series of transactions in the Project can be summarized as follows. Carlisle and Cabela’s want to develop a sportsman’s retail facility and entertainment complex on certain undeveloped property that they currently own or will purchase in Gonzales, Louisiana. Ultimately, for approximately $50 million, the IDB will buy about 49 acres of the property from Cabela’s, on which a Cabela’s hunting and fishing retail store, a wildlife museum, boat facility, restaurant, and related infrastructure will be constructed. To finance the land purchase, the construction of the improvements, and related transactions, the IDB will incur approximately $50 million in debt by issuing thirty-year Bonds,[1] which will be purchased by Car-lisle and Cabela’s. This debt of the 12IDB will be repaid to Carlisle and Cabela’s (and/or any subsequent bondholders), with interest, using sales tax revenue of the City of Gonzales and the State of Louisiana generated by the Cabela’s property.[2] Cabela’s will lease the multi-million dollar retail store and all related improvements on the property from the IDB during the term of the Bonds, but will not pay any rent to the IDB. Under the lease agreement, the only “rent” Cabela’s will pay for the use of the property will be property taxes equal to what would be owed by a private owner of the property, plus “additional rents” in the form of maintenance costs, insurance costs, and improvement costs to whatever companies supply those services to Cabela’s. None of those payments will go to the property owner/lessor, the IDB. Cabela’s will also manage the property and will be entitled to a management fee from IDB during the term of the Bonds, which fee will be deferred.[3] *754 When the Bonds expire or are paid in full, Cabela’s will have the option to buy the property, including the retail store, museum, the related facilities, and infrastructure for its then fair market value, whatever that may be. However, that purchase price will be substantially reduced (and possibly eliminated) by certain offsets, including the price Cabela’s paid for the property before transferring it to the IDB, all of the above-described “rents” and “additional rents” that were paid to entities other than the IDB, the amount of the full deferred management fee with accrued interest, a credit of $2500 for each full-time job and $1250 for each part-time job created at Cabela’s retail store, and $1.9 million for each year of operation. In the lease agreement, Cabela’s magnanimously agrees that, should these offsets exceed the purchase price, the IDB will not have to pay Cabela’s the excess.
Regardless of what might ultimately occur when Cabela’s exercises its option to purchase the property from the IDB, it is clear that during the term of the Bonds, while Cabela’s is enjoying the use of the retail store and related facilities, it will not be paying IDB anything for the use of this property, all of which will be bought and paid for using [.-¡public tax dollars. This rent-free use of government-owned property amounts to a donation of that property to a private entity.[4]
Article VII, Section 14 of the Louisiana Constitution of 1974 states unequivocally in the first sentence of paragraph A:
Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.
This being a distinct prohibition in the constitution, the only way the financing scheme for this Project can be constitutional is if there is some constitutional authority for this subsidizing of a private business entity. Legislative authority in the form of the TIF Act will not suffice. There are certain exceptions in Article VII, Section 14(B), none of which apply to this type of endeavor. The IDB contends that constitutional authority for this Project is found in Article VI, § 21, which states, in pertinent part:
(A) Authorization. In order to (1) induce and encourage the location of or addition to industrial enterprises therein which would have economic impact upon the area and thereby the state, (2) provide for the establishment and furnishing of such industrial plant, or (3) provide movable or immovable property, or both, for pollution control facilities, the legislature by law may authorize, subject to restrictions it may impose, any political subdivision, deep-water port commission, or deep-water port, harbor, and terminal district to:
(a) issue bonds, subject to approval by the State Bond Commission or its successor, and use the funds derived from the sale of the bonds to acquire and improve industrial plant sites and other property necessary to the purposes thereof;
(b) acquire, through purchase, donation, exchange, and (subject to Article I, Section 4) expropriation, and improve industrial plant buildings and industrial plant equipment, machinery, furnishings, and appurtenances; and
*755 (c) sell, lease, lease-purchase, or demolish all or any part of the foregoing.
The key to this article of the Louisiana Constitution is the use of the words, “industrial enterprises,” “industrial plant,” “industrial plant sites,” “industrial plant buildings and industrial plant equipment, machinery, furnishings, and appurtenances.” The consistent and repeated use of the modifier, “industrial,” emphasizes that the drafters of this article intended to limit it to a particular type of enterprise, not just any | ¿business venture that might have some positive economic impact on the area or the state. Constitutional provisions must be given their ordinarily understood meaning, using the same rules of interpretation that govern the interpretation of statutes. Caddo-Shreveport Sales and Use Tax Comm’n v. Office of Motor Vehicles, 97-2233 (La.4/14/98), 710 So.2d 776, 780. The word, “industrial,” is generally understood to encompass a manufacturing process or an enterprise using heavy equipment and/or complex technology to produce or assemble a product. The word is never understood as the equivalent of “retail,” and in fact, is more likely to denote the opposite of “retail.”
Had the drafters of the Louisiana Constitution wanted to allow public funds to be used for any type of “economic or industrial development,” they could certainly have broadened the constitutional authority in Article VI or created another exception to the prohibition in Article VII, § 14(A). In fact, no less than six separate attempts have been made to amend and expand the Louisiana Constitution to allow governmental entities to use public funds to directly or indirectly subsidize private business entities in order to further “economic or industrial development” in various ways.[5] Each of those proposed amendments were defeated, indicating clearly that the public does not want its tax dollars to be spent for the benefit of selected private - enterprises under the banner of “economic development.”
For these reasons, I do not believe there is constitutional authority for this particular use of public funds, which amounts to a donation of thirty years’ rent-free use of property purchased, and constructed by a governmental entity using tax dollars. Accordingly,. I respectfully dissent.

. The Bonds will also be used to finance public improvements and infrastructure needed for the "Sportsman Park Center" to be developed on other property in the District that will continue to be owned by Carlisle.

. The state's contribution is limited to $10.5 million.

.A point of interest is that the management compensation is described as "the actual costs and expenses arising out of the operation, maintenance and repair” of the Cabela's property, plus associated personnel costs, which sounds very much like the items designated as "additional rents.”

. Incidentally, the Project also involves a pledge of city and state sales taxes as security for the Bonds.

. See 1989 La. Acts, No. 843; 1990 La. Acts, No. 1102; 1991 La. Acts, No. 1067; 1992 La. Acts, No. 1145; 2000 La. Acts, No. 152; and 2003 La. Acts, No. 1303.